UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | | |
|---|---|---|
| RICHARD A. PITINO | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. _3:17-cv-722-DJH_ |
| | ) | |
| UNIVERSITY OF LOUISVILLE | ) | |
| ATHLETIC ASSOCIATION, INC. | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

## VERIFIED COMPLAINT

The Plaintiff, Richard A. Pitino (Coach Pitino), states his complaint against the

University of Louisville Athletic Association, Inc. (ULAA), as follows:

## Preliminary Statement

1.      This is a state law claim for damages resulting from a breach of contract.

Coach Pitino alleges that ULAA materially breached his employment contract when it

effectively fired him — by placing him on administrative leave — without providing the

notice required by the parties' contract, then failed to remedy its breach within thirty days

after Coach Pitino notified ULAA of its material breach.  Coach Pitino further alleges

that ULAA compounded its breach — when it purported to fire him "for cause," even

though ULAA lacked legal cause as defined by the parties' contract, — then failed to

remedy that breach within thirty days after Coach Pitino properly notified ULAA of its

material breach.  Coach Pitino seeks damages equal to the full unpaid balance of his

contract, consistent with the terms of the contract's liquidated damages clause.

## Jurisdiction and Venue

2.      This Court has jurisdiction under 28 U.S.C. § 1332, which provides for original district court jurisdiction over cases between citizens of diverse states.

3.      Venue is proper because ULAA's principal place of business is in Jefferson County, Kentucky, and because many of ULAA's actions took place in Jefferson County, Kentucky.

## Parties

4.      Plaintiff, Richard A. Pitino, is an adult citizen of Florida.  At the time of the events described in this complaint, Coach Pitino lived in Jefferson County, Kentucky.

5.      Defendant, University of Louisville Athletic Association, Inc., is a non-profit Kentucky corporation with its principal place of business in Jefferson County, Kentucky.

## Factual Allegations

*Background and Chronology*

6.      ULAA operates the intercollegiate athletic programs of the University of Louisville.

7.      Coach Pitino served as the head coach for the University of Louisville men's basketball team from 2001 to October 16, 2017.  His most recent employment contract with ULAA (the EC) became effective on July 1, 2015.  [A copy of the current EC is attached as Ex. 1.]

8.      Under § 6.1 of the EC, ULAA could terminate the EC for "just cause," or impose "other appropriate discipline."  Either sanction required ULAA to give "ten (10) days' prior written notice and an opportunity to be heard" before imposing discipline.

"Just cause," within the meaning of the EC, is defined as the conduct detailed in §§ 6.1.1 through 6.1.4.

9.      Under § 6.5 of the EC, Coach Pitino could terminate the EC if ULAA was "in material breach of" the EC's terms, and if ULAA failed to remedy that breach "within thirty (30) days following written notice from [Coach Pitino] to [ULAA] specifying such breach in detail."

10.     The recently-unsealed complaint (Complaint) in *United States v. James Gatto, et al.*, Crim. No. 17-MJ-7120 (U.S. Dist. Ct., SDNY), detailed a conspiracy to improperly and illegally funnel money from Adidas America, Inc. (Adidas), a sport apparel company, to the families of high school basketball recruits, in order to induce those recruits' attendance at specific Adidas-affiliated colleges, and ensure their signing with favored Adidas-related agents after those recruits turned pro.  The University of Louisville is one such Adidas-affiliated college.  According to the Complaint, Adidas paid money through intermediaries to the family of Brian Bowen, who then committed to attend and play basketball for the University of Louisville.  (The Complaint does not identify any of these parties, but Coach Pitino believes that Adidas is "Company-1," he is "Coach-2," Bowen is "Player-10," and the University of Louisville is "University-6.")

11.     Coach Pitino had no part — active, passive, or through willful ignorance — in the conspiracy described in the Complaint.  Coach Pitino never has had any part — active, passive, or through willful ignorance — in any effort, successful or unsuccessful, completed or abandoned, to pay any recruit, or any family member of a recruit, or anyone else on a recruit's behalf, as an inducement to attend the University of Louisville.

12.     On the contrary, Coach Pitino has striven to ensure that the University of

Louisville men's basketball program operates cleanly, properly, and in strict compliance with all regulatory requirements.  He demanded that his assistant coaches and staff members strictly comply with all such regulatory requirements.  And that has been particularly true since the revelations in 2015 that an assistant coach had provided improper benefits (the escort matter) to recruits or players, and in light of the 2017 NCAA sanctions in the escort matter.

13.     Despite this, two days after the Complaint was unsealed, ULAA imposed discipline upon Coach Pitino.  Upon information and belief, ULAA conducted no independent investigation, and obtained no new facts, between the date that the Complaint was unsealed and the date ULAA imposed discipline.  By letter dated September 27, 2017, saying that the Complaint "insinuate[d] a scheme of fraud and malfeasance … involving you …," ULAA placed Coach Pitino on unpaid leave, locking him out of his office, relieving him of all duties, blocking his access to email, and effectively firing him.  [A copy of ULAA's disciplinary letter is attached as Ex. 2.]  It did so without providing the notice required by § 6.1 of the EC.  (The notice purported to pay Coach Pitino for ten days, in lieu of complying with the notice requirement.)  In addition, ULAA failed to serve its disciplinary letter in the manner provided for by the EC.

14.     By letter dated September 29, 2017, Coach Pitino notified ULAA that it was in material breach of the EC by imposing discipline without the requisite notice, and without proper service.  Coach Pitino informed ULAA that he would invoke his right to terminate the EC under § 6.5 unless ULAA remedied its material breach within thirty days.  [A copy of Coach Pitino's letter is attached as Ex. 3.]

15.     ULAA did not attempt to remedy its breach.  Instead, it hired an interim

basketball coach, and proceeded to fire Coach Pitino, allegedly for "just cause."  By letter

dated October 3, 2017, ULAA stated its intention to fire Coach Pitino under §§ 6.1 and

6.3 of the EC.  [A copy of ULAA's termination letter is attached as Ex. 4.]

*ULAA's Charges*

16.     ULAA cited three events as giving rise to termination.  Those events are:

(1) the escort matter that led the NCAA, in its June 15, 2017 Committee on Infraction's

report, to find that Coach Pitino failed to monitor and exercise sufficient oversight of

staff; (2) the Complaint, setting out a scheme of fraud and malfeasance allegedly

(according to ULAA) "involving [Coach Pitino] and multiple members of [his] coaching

staff"; and (3) Coach Pitino's failure to notify the athletics compliance staff of Christian

Dawkins' presence on campus in late May 2017.

17.     According to ULAA, these three events gave it eight grounds to find "just

cause" to terminate the EC:  (1) § 6.1.2, because of disparaging media publicity of a

material nature that damages UL or ULAA's good name, caused by Coach Pitino's

willful misconduct; (2) § 6.1.3, because of a major ULAA, ACC, or NCAA rule

violation; and (3) § 6.1.1, because of material contract violations in (a) failing to

diligently supervise compliance of assistant coaches, § 4.1.3, (b) failing to promote an

atmosphere of compliance, academic integrity, and ethical conduct within the basketball

program, and failing to monitor the activities of all assistant coaches and administrators

in the program who report, directly or indirectly, to Coach Pitino, § 4.3, (c) failing to

notify compliance staff of concerns or red flags relating to Brian Bowen's late

commitment, and failing to notify compliance staff of Dawkins' presence on campus, §

4.3.5, (d) failing to ensure staff cooperation with investigations, and failing to accept

responsibility for maintaining the integrity of the investigation and enforcement process, § 4.3.6, (e) failing to take responsibility for violations, § 4.3.7, and (f) failing to actively monitor the staff's activities, resulting in the commitment of multiple NCAA Level-1 violations, § 4.3.8.

18.     ULAA gave Coach Pitino an opportunity to respond and, on October 16, 2017, held a hearing at which Coach Pitino offered his response.  In his oral and written responses, he explained in detail why none of the three specific events gave ULAA just cause to terminate the EC.  [A copy of Coach Pitino's written response, including exhibits, is attached as Ex. 5.]

*Coach Pitino's Response — Events*

19.     With respect to the escort matter, Coach Pitino explained that — while the NCAA found that he had failed to monitor, or exercise sufficient oversight of, his staff — both Coach Pitino and UL disagreed, and the NCAA's finding currently is on appeal. Any sanction during the appeal's pendency was therefore premature.  In addition, any assertion now by ULAA that Coach Pitino failed to properly monitor and supervise the basketball staff is inconsistent with, and contradicted by, President Postel's public statements and the University's position before the NCAA, which was that Coach Pitino "could not have known about the illicit activities."  Nothing occurred between September 26, 2017 (the date that the Complaint was unsealed) and October 4, 2017 (the date of ULAA's termination letter) to justify a change in that position.  Finally, the escort matter occurred during the operation of Coach Pitino's prior contract, dated July 1, 2012, not the current one.  Under the prior contract's terms, ULAA has no basis to terminate Coach Pitino for the escort matter.  [A copy of the prior employment contract is attached as Ex.

6.]  The prior contract's version of § 6.1.3 provided that Coach Pitino "shall not be responsible for conduct of third parties, assistants, or other representatives of the athletic interests of [UL and ULAA] unless [he] was aware of such misconduct and failed to promptly report it … or failed to exercise diligent, careful supervision … which could have disclosed the violation."  Under those express terms, the *fact* of the escort matter provides no grounds for terminating the contract for cause; rather, termination requires proof that Coach Pitino failed to exercise diligent, careful supervision — a proposition that the University, the ULAA Board, and President Postel have repeatedly and consistently rejected.  Simply put, if UL's President "believe[s]" that Coach Pitino "could not have known about the illicit activities," ULAA cannot fault him for that lack of knowledge.  Moreover, ULAA cannot terminate the EC for events that occurred before it went into effect, especially when ULAA has known about those events for two years, actively fought against the imposition of any sanctions against Coach Pitino, and believes that Coach Pitino "could not have known about the illicit activities."

20.     With respect to the Dawkins matter, Coach Pitino explained that the Complaint makes clear that Dawkins was not an "agent," even under the NCAA's broad definition, and was no longer employed by the sports management company at the time of his campus visit.  Rather, Dawkins had been associated with an AAU team.  Coach Pitino knew Dawkins only in that capacity, not as an agent.  Coach Pitino understood that Dawkins visited UL with the Bowen family through an AAU connection.  Coach Pitino never understood that Dawkins was an agent, and Bowen's mother stated that Dawkins was not an agent in any regard for Bowen.  The campus visit thus was completely in compliance with University and NCAA rules and regulation.  Coach Pitino had neither an

obligation nor a reason to notify "Athletics Compliance" of Dawkins' presence on campus.  Indeed, there appears to be no such reporting requirement even for agents.

21.     With respect to the conspiracy described in the Complaint, Coach Pitino explained that the 29-page unsealed document mentions him in only three places, none of which credibly provides evidence of wrongdoing.  First, Brad Augustine — one of those charged in the case — bragged about Coach Pitino's influence with Adidas.  But his statement does not allege that Coach Pitino *did* anything, just that Augustine believed that Coach Pitino *could* do things given his clout.  Second, Dawkins — another charged party — told others that he had spoken with Coach Pitino about getting additional money for Brian Bowen's family, and had told Coach Pitino that he needed him to call James Gatto.  Coach Pitino has unequivocally denied that such a conversation ever took place.  And Dawkins' statement lacks all credibility.  The FBI was listening to Dawkins' telephone calls pursuant to a court-authorized wiretap.  Had the conversation that Dawkins claimed he had with Coach Pitino actually taken place, the Complaint surely would have said so.  The Complaint does not even allege that any such call ever took place (much less quote its content).  In addition, text messages between Dawkins and Coach Pitino show no conversations that even suggest any inappropriate communications between them.  On the contrary, the text messages support that Dawkins and the Bowen family believed that UL and Coach Pitino were the best fit for Brian.  Third, the Complaint alleges that, according to telephone records, Coach Pitino communicated with Jim Gatto — an Adidas executive charged in the case — in late May and early June.  But there is no allegation that those calls were anything but entirely innocent, and no allegation that they had anything to do with an improper scheme.  Nor would any communication with Gatto be

surprising.  Adidas has outfitted the UL men's basketball team for several years, and the University and Adidas signed a $160 million, ten-year, contract extension in August 2017.  At no time did Coach Pitino and Gatto discuss — overtly, covertly, in code, through nuance, or in any other way — the provision of improper benefits to any UL basketball player or recruit.  And again, text messages between Gatto and Coach Pitino revealed that all communications were completely appropriate.

*Coach Pitino's Response — Adverse Publicity and Rule Violations*

22.     Having shown ULAA that none of the three specific events gave rise to "just cause" to terminate the EC, Coach Pitino detailed why he did not violate his contract in any of the eight ways charged.

23.     With respect to disparaging media publicity, Coach Pitino explained that — although both the escort matter and the Complaint conspiracy have resulted in disparaging media publicity — that is not enough to find cause for contract termination under § 6.1.2.  Rather, that section requires that the disparaging media publicity result from Coach Pitino's "willful misconduct."  That clearly is not the case here.  Coach Pitino denied any willful misconduct in the escort matter; UL denied any willful misconduct in the escort matter; the NCAA found no willful misconduct in the escort matter.  There is, quite simply, no proof from which ULAA could find that any disparaging media publicity related to the escort matter resulted from Coach Pitino's willful misconduct.  Coach Pitino likewise denied any willful misconduct related to the conspiracy detailed in the Complaint.  Nor does the Complaint provide any basis for inferring such willful misconduct.  Once again, there simply is no proof from which ULAA could find that any disparaging media publicity related to the Complaint, and the

events detailed in it, resulted from Coach Pitino's willful misconduct.

24.     With respect to major rule violations, the recently unsealed Complaint contained no allegation that Coach Pitino engaged in any conduct constituting a major ULAA, ACC, or NCAA rule violation.  Nor is there any proof that he engaged in that conduct.  As a result, there is no basis for finding that Coach Pitino breached § 6.1.3 of his contract with respect to the Complaint or the events detailed in it.  And the events underlying the escort matter took place during the time that Coach Pitino's 2012 contract was in effect.  The NCAA found that Coach Pitino committed a Level I violation by failing to adequately supervise or oversee the basketball staff; UL and Coach Pitino both dispute that finding, and the matter is under appeal.  President Postel has said that the NCAA's finding is "unfair to Coach Pitino" because he "could not have known about the illicit activities."  Again, any sanction during the appeal's pendency is premature; any assertion now by ULAA that Coach Pitino failed to properly monitor and supervise the basketball staff is contradicted by the University and President Postel's public statements, and the University's formal position before the NCAA.  But, beyond that, the escort matter occurred during the operation of Coach Pitino's prior contract.  Under § 6.1.3 of the prior contract, Coach Pitino "shall not be responsible for conduct of third parties, assistants, or other representatives of the athletic interests of [UL and ULAA] unless [he] was aware of such misconduct and failed to promptly report it … or failed to exercise diligent, careful supervision … which could have disclosed the violation."  ULAA thus cannot terminate Coach Pitino's current contract for events that occurred during his prior contract without finding that he failed to exercise diligent, careful supervision — a proposition that UL and President Postel have repeatedly and consistently rejected.

25.     Thus, there was no plausible basis for ULAA to find that it had cause to terminate Coach Pitino's contract for disparaging media publicity or a major rule violation.  Rather, any termination hinged on ULAA finding proof to support one of the six ways that it says Coach Pitino materially violated the EC.  Coach Pitino explained in detail why there is no such proof.

*Coach Pitino's Response — Contract Violations*

26.     First, ULAA charged Coach Pitino with violating § 4.1.3 by failing to diligently supervise his assistant coaches' compliance with rules.  The proof is, however, that Coach Pitino diligently supervised his staff and insisted on their compliance with the rules.  He drilled compliance into his coaches and assistants at every meeting.  He met with his coaches and assistants frequently and kept well informed about their activities. He implemented and faithfully adhered to all recommendations that Athletic Director Tom Jurich and President Postel made after the escort matter.  He thus did everything reasonably possible to maximize his diligent supervision of assistant coaches and staff. "Diligent supervis[ion]" is not a guarantee of compliance; if it were, the EC would have made Coach Pitino strictly liable for his assistant coaches' alleged misdeeds (and it does not).  Indeed, any non-compliant subordinate — like any employee engaging in willful misconduct in any employment setting — likely will seek to avoid detection despite diligent supervision.  ULAA thus cannot conclude that there was a failure of diligent supervision just because of subordinates' misconduct; otherwise, that would be requiring a guarantee.  On the contrary, for ULAA to find that Coach Pitino failed to diligently supervise his staff, it must have proof; it cannot simply rely on the fact that staff members misbehaved.  That proof might consist of contrary evidence from assistant coaches and

staff, or that Coach Pitino failed to implement or adhere to AD Jurich and President

Postel's recommendations, or that his supervision was deficient compared to other

schools, or that his supervision was deficient compared to other times in UL history.  But,

absent that proof, ULAA had no basis for finding that Coach Pitino failed to diligently

supervise his staff.  Upon information and belief, ULAA had no contrary proof, and thus

had no basis for concluding that that Coach Pitino violated § 4.1.3.

27.    Second, ULAA charged Coach Pitino with violating § 4.3 by failing to

promote an atmosphere of compliance, academic integrity, and ethical conduct within the

basketball program, and by failing to monitor the activities of all assistant coaches and

administrators in the program who report, directly or indirectly, to him.  Once again,

"promot[ion] of an atmosphere" or "monitor[ing of]" activities cannot, and do not,

guarantee compliance.  Coach Pitino repeatedly stressed to his staff his insistence on rule

compliance, integrity, and ethics, and routinely monitored staff activity.  For ULAA to

find that Coach Pitino failed to promote a required atmosphere, or failed to adequately

monitor his staff, or diligently supervise his staff, it must have proof; it cannot simply

rely on the fact that staff members misbehaved.  Again, that proof might consist of

contrary evidence from assistant coaches and staff, or that Coach Pitino failed to

implement or adhere to AD Jurich and President Postel's recommendations, or that his

conduct was deficient compared to other schools, or that his conduct was deficient

compared to other times in UL history.  But, absent that proof, ULAA has no basis for

finding that Coach Pitino failed to promote an atmosphere of compliance, integrity and

ethics, or failed to monitor his staff.  Upon information and belief, ULAA had no

contrary proof, and thus had no basis for concluding that that Coach Pitino violated § 4.3.

28.     Third, ULAA charged Coach Pitino with violating § 4.3.5 by failing to notify compliance staff of concerns or red flags relating to Brian Bowen's late commitment and Dawkins' presence on campus.  As for Bowen, Coach Pitino had no reason to suspect that something illicit was behind his commitment.  Indeed, Bowen's mother has stated that she knew nothing about any money paid, and that Bowen committed to UL because he liked the staff and program and wanted to go to UL for entirely legitimate reasons.  And although Bowen's decision came late in the process, there were obvious basketball reasons supporting it.  In any event, Bowen's surprise commitment was quite public, so the compliance staff knew as much about it as Coach Pitino did.  The FBI has since cleared Bowen, indicating that he had no knowledge of payments.  As for Dawkins, Coach Pitino has testified that he did not know, and had no reason to know, that Dawkins was on campus in any capacity other than through his AAU connections with the Bowen family.  He was never told that Dawkins was an agent and, as the Complaint makes clear, Dawkins was not a registered agent, and was no longer employed by a sports management company at the time of his visit.  Moreover, there appears to be no reporting requirement even if Dawkins was an agent.  Coach Pitino thus was under no obligation to report Dawkins' presence on campus.

29.     Fourth, ULAA charged Coach Pitino with violating § 4.3.6 by failing to ensure staff cooperation with investigations, and by failing to accept responsibility for maintaining the integrity of the investigation and enforcement process.  On the contrary, Coach Pitino has done everything possible to ensure staff cooperation with investigations, and has voluntarily met with and provided information to FBI agents; ULAA has the burden to prove otherwise and, upon information and belief, has no such contrary proof.

Coach Pitino also fully accepts his responsibility for maintaining the integrity of the investigation and enforcement process and believes that he has done so; again, ULAA has the burden to prove otherwise and, upon information and belief, has no such contrary proof. Finally, ULAA is in no position to gauge Coach Pitino's failure to "take responsibility" when it hasn't communicated with him — except through disciplinary letters and verbal statements — since the Complaint was unsealed.

30. Fifth, ULAA charged Coach Pitino with violating § 4.3.7 by failing to take responsibility for his involvement in, or knowledge of, violations. As detailed above, he insists that he has done so; ULAA has the burden to prove otherwise and, upon information and belief, has no such contrary proof. Finally, ULAA is in no position to gauge Coach Pitino's failure to "take responsibility" for violations when it hasn't communicated with him — again, except through disciplinary letters and verbal statements — since the Complaint was unsealed.

31. Sixth, ULAA charged Coach Pitino with violating § 4.3.8 by failing to actively monitor his staff's activities, resulting in the commitment of multiple NCAA Level-1 violations. Coach Pitino did actively monitor those activities; ULAA has the burden to prove otherwise and, upon information and belief, has no such contrary proof. In any event, consistent with the "diligent supervis[ion]" discussion above, "active monitoring" is not a guarantee of compliance. A staff member's non-compliance likely will be designed to avoid detection *despite* active monitoring. ULAA thus cannot conclude that there was a failure of active monitoring just because of a staff member's misconduct; otherwise, that would be requiring a guarantee. Here, the proof is that Coach Pitino actively monitored his staff and insisted on their compliance with the rules.

He drilled compliance into his coaches and assistants at every meeting.  He met with his coaches and assistants frequently and kept well informed about their activities.  He implemented and strictly adhered to AD Jurich and President Postel's recommendations in the wake of the escort matter.  For ULAA to conclude that Coach Pitino failed to actively monitor his staff, it must have proof; it cannot simply rely on the fact that staff members misbehaved.  That proof might consist of contrary evidence from assistant coaches and staff, or that Coach Pitino failed to implement or adhere to AD Jurich and President Postel's recommendations, or that his monitoring was deficient compared to other schools, or that his monitoring was deficient compared to other times in UL history.  But, absent that proof, ULAA has no basis for finding that Coach Pitino failed to monitor his staff.  Upon information and belief, ULAA had no contrary proof, and thus had no basis for concluding that that Coach Pitino violated § 4.3.8.

_Conclusion, Notice of Breach, and Damages_

32.    For all the reasons detailed above, Coach Pitino demonstrated that ULAA had no factual basis for concluding that he had violated the EC, or that he had given ULAA "just cause" to fire him.

33.    Despite that, on October 16, 2017, ULAA's governing board voted to terminate Coach Pitino's employment, concluding that it had "just cause" to terminate the EC. [A copy of ULAA's notice of termination for just cause is attached as Ex. 7.]

34.    ULAA did not have just cause to fire Coach Pitino.  ULAA did not have just cause to terminate the EC.  On October 25, 2017, Coach Pitino notified ULAA that it was in material breach of the EC by firing him without just cause, and by purporting to terminate the EC.  Coach Pitino informed ULAA that he would invoke his right to

terminate the EC under § 6.5 unless ULAA remedied its material breach within thirty days.  [A copy of Coach Pitino's letter is attached as Ex. 8.]

35.     By failing to remedy the material breach identified in Coach Pitino's September 29, 2017 letter, by compounding that failure in firing Coach Pitino and purporting to terminate the EC, all as identified in Coach Pitino's October 25, 2017 letter, ULAA has given Coach Pitino grounds for properly terminating the EC.

36.     On November 27, 2017, Coach Pitino notified ULAA by letter that he was invoking his right to terminate the EC under § 6.5 for its failure to remedy its material breach of contract.  [A copy of Coach Pitino's termination letter is attached as Ex. 9.]

37.     Section 6.5 provides that, if Coach Pitino terminates the EC for ULAA's failure to remedy its material breach, "[ULAA] shall pay to [Coach Pitino], as liquidated damages, an amount equal to the compensation due to [Coach Pitino] per Sections 3.1.1, [and] 3.1.2, … for the balance of the Term."  That liquidated damages provision entitles Coach Pitino to payment of $4,307,000 per year, through June 30, 2026.

38.     Coach Pitino also lost his endorsement contract with Adidas as a direct result of ULAA's decision to fire him.  That contract was worth a minimum of $1,500,000 per year.  If, for some reason, Coach Pitino's damages for ULAA's breach are not to be measured by the EC's liquidated damages provision, then ULAA is further liable to Coach Pitino for the value of his lost endorsement contract.

### Claims for Relief

### First Cause of Action:  Breach of Contract

39.     For all the reasons described above, ULAA's September 27, 2017 decision to place Coach Pitino on administrative leave, without proper notice, and without proper

service of notice, constitutes a material breach of contract.

40.     ULAA has failed to remedy its material breach of contract despite proper

notice from Coach Pitino.

41.     As a result, Coach Pitino is entitled to terminate, and has indeed

terminated, the EC.  Pursuant to § 6.5 of the EC, ULAA is obligated to pay Coach Pitino,

as liquidated damages, the sum of $4,307,000 per year, from the date of its last payment

through June 30, 2026.  In the alternative — that is, if for some reason the liquidated

damages provision does not apply, — ULAA is obligated to pay Coach Pitino for his

actual losses, including the value of his lost Adidas endorsement contract.

## Second Cause of Action:  Breach of Contract

42.     For all the reasons described above, ULAA was entitled to terminate the

EC for "just cause" only if Coach Pitino violated one or more of the items detailed in §§

6.1.1 through 6.1.4 of the EC.

43.     Coach Pitino did not violate the items detailed in §§ 6.1.1 through 6.1.4 of

the EC, and — at the time it purported to fire him and terminate the EC — ULAA had no

contrary proof that he did.

44.     ULAA thus had no right to terminate the EC for "just cause," and its

decision to fire Coach Pitino constitutes a breach of contract.

45.     ULAA has failed to remedy its material breach of contract despite proper

notice from Coach Pitino.

46      Pursuant to § 6.5 of the EC, ULAA is obligated to pay Coach Pitino, as

liquidated damages, the sum of $4,307,000 per year, from the date of its last payment

through June 30, 2026.  In the alternative — that is, if for some reason the liquidated

damages provision does not apply, — ULAA is obligated to pay Coach Pitino for his actual losses, including the value of his lost Adidas endorsement contract.

## **REQUEST FOR RELIEF**

WHEREFORE, Coach Pitino requests the following:

1.    Judgment against ULAA for breach of contract;

2.    An award of liquidated damages consistent with § 6.5 of the EC, in the sum of $4,307,000 per year, from the date of ULAA's last payment through June 30, 2026;

3.    In the alternative — that is, if for some reason the liquidated damages clause does not apply, — an award of damages for his actual losses, including the value of his lost Adidas endorsement contract, for all time periods through June 30, 2026;

4.    An award of prejudgment and post-judgment interest;

5.    Recovery of all litigation costs allowed by law; and

6.    All other relief to which he is entitled.

*/s/Stephen B. Pence*
Stephen B. Pence
PENCE & WHETZEL, PLLC
9300 Shelbyville Road, Suite 1205
Louisville, KY 40223
(502) 736-6200
steve@pencelegal.com

*/s/ Kurt A. Scharfenberger*
Kurt A. Scharfenberger
SCHARFENBERGER LAW OFFICE
239 S. Fifth Street, Suite 800
Louisville, KY 40202
(502) 561-0777
kurt@scharfenberger-law.com

*Counsel for Plaintiff*